Brindee Collins
**COLLINS LAW PLLC**
6126 W. State Street
Boise, Idaho 83703
Telephone: (208) 254-7699
ISB # 9216
brindee@collinslawidaho.com
**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TRACY RODGERS, an individual, and ROBERT MCCAULEY, an individual, | ) ) ) **COMPLAINT** |
| Plaintiffs, | ) ) Civil No. |
| v. | ) ) Judge: |
| COLOR STREET LLC, a New Jersey limited liability company, FA YOUNG PARK, an individual, LISA R. SCHMITT, an individual, and ANGELA MARIE POLSGROVE, an individual, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

For their Complaint, Plaintiffs Tracy Rodgers and Robert McCauley, by and through

undersigned counsel, allege and aver as follows:

### PARTIES, JURISDICTION & VENUE

1.      Plaintiff Tracy Rodgers ("Rodgers") is an individual who resides at 4170 Westway

Drive, Coeur d'Alene, Idaho.

2.      Plaintiff Robert McCauley ("McCauley") is an individual who resides at 4170

Westway Drive, Coeur d'Alene, Idaho.

3.      Defendant Color Street LLC ("Color Street") is a New Jersey limited liability

company with a principal place of business located at 922 Riverside Drive, Totowa, New Jersey.

1

Color Street is a multi-level marketing company that, according to its website, sells, markets, and ships its products in the fifty United States, the District of Columbia, Puerto Rico, Guam, and Canada. Color Street nails are also sold through third party websites including Amazon and Wal-Mart.

4.      Defendant Fa Young Park ("Park") is the founder and CEO of Color Street, and, upon information and belief, its sole owner. Park is a resident of Florida.

5.      Defendant Lisa R. Schmitt ("Schmitt") is and was at all relevant times the Vice President of Field Development at Color Street. Upon information and belief, Schmitt resides at 7 Belvoir Drive, Washingtonville, New York 10992.

6.      Defendant Angela Marie Polsgrove ("Polsgrove") is and was at all relevant times the Senior Director of Sales at Color Street. Upon information and belief, Polsgrove resides at 1464 Lawncrest Court NE, Grand Rapids, Michigan 49505.

7.      Pursuant to 28 U.S.C. § 1332(a), this Court has original jurisdiction over Plaintiffs' claims based on diversity of citizenship and because the amount in controversy exceeds $75,000.00.

8.      This Court has personal jurisdiction over each of the Defendants because they have transacted business in Idaho and because they have committed tortious acts in Idaho including, but not limited to, specifically directing their false and defamatory statements at Rodgers, an Idaho resident, signing up Independent Stylists who are Idaho residents on behalf of Color Street, and selling and marketing Color Street products in Idaho both directly and through third parties.

9.      Further, pursuant to I.C. § 10-1201, this Court has jurisdiction to declare the rights, status, and obligations of Rodgers, McCauley, and Color Street with respect to the Independent Stylist Agreement including, but not limited to, the arbitration provision therein.

10.     Venue is proper before this Court pursuant to 28 USC § 1391 and because the false and defamatory statements made by Defendants were made with the intent to harm and directed towards Rodgers, an Idaho resident.

## FACTUAL ALLEGATIONS

11.     Color Street is a multi-level marketing ("MLM") company formed by Park in or about 2017 for the primary purpose of making and selling colorful sticker like nail strips to be used in lieu of traditional nail polish.

12.     MLM companies are also sometimes referred to as direct marketing companies or network marketing companies.

13.     As an MLM, Color Street enlists individuals to become what it refers to as "Independent Stylists" who invest their own money to acquire, and then sell, Color Street's products.

14.     Rodgers has nearly forty years' experience working in network marketing.

15.     In April 2017, before Color Street publicly launched its products, Rodgers learned about Color Street and signed up to be a Color Street Independent Stylist.

16.     To do this, Rodgers went to a web page that contained fields for a name, address, and phone number as well as credit card information that would be stored until Color Street was ready to charge the card at a later date.

17.     Rodgers did not execute or otherwise agree to any contracts or other written or verbal agreements and did not (nor was she required to) "click" any electronic boxes agreeing to any terms or conditions to become an Independent Stylist.

18.     On or about June 12, 2017, Rodgers received a link via email containing login credentials which provided her access to Color Street's back-office solution. Rodgers did not click or

sign anything to gain such access, nor was she required to agree to any terms or conditions in the process. Rodgers also received an ID number that she would then use to refer others to Color Street.

19.     Rodgers received no marketing support from Color Street. Instead, Rodgers used her personal connections and social media to recruit additional network marketing professionals for Color Street, using her ID number for referral. Each person who used Rodgers' ID number as their referral source for Color Street, and everyone they referred, was connected to Rodgers, and ultimately became part of Rodgers' team or her "downline."

20.     From April 2017 through February 11, 2022, Rodgers used her personal connections, including those developed during her decades in the network marketing world, social media, and personal funds to grow her Independent Stylist business at Color Street to the point that there were more than 40,000 individuals in her downline throughout the United States.

21.     In 2018, McCauley signed up to be an Independent Stylist with Color Street. Like Rodgers, McCauley did not execute, click, or otherwise agree to any contracts or other agreements with Color Street.

22.     Ultimately, McCauley did not regularly engage in actively selling Color Street products.

23.     For nearly five years, Rodgers was one of Color Street's top performers.

24.     During her time with Color Street, Rodgers and her downline were responsible for nearly $500,000,000.00 in sales of Color Street products.

25.     Rodgers' success in network marketing was well known and she was frequently invited to speak at network marketing trainings and other events outside of Color Street.

26.     From the time she became an Independent Stylist with Color Street in 2017 through February 2022, at no time did Rodgers execute or otherwise agree to any terms and conditions to commence or continue her work as an Independent Stylist at Color Street.

27.     From the time he became an Independent Stylist with Color Street in 2018 through February 2022, at no time did McCauley sign or otherwise agree to any terms and continues to commence or continue his work as an Independent Stylist at Color Street.

28.     From June 2017 until 2022, Color Street regularly used Rodgers' name, image, and likeness and benefitted from such use, without compensation to Rodgers.

29.     During her time with Color Street, Rodgers was regularly asked to speak at Color Street events and did speak at such events, without compensation and with threat of termination or other punishment should she decline.

30.     In late 2020 and early 2021, Color Street made numerous arbitrary management decisions that changed the compensation structure for its Independent Stylists. As a result of these changes, Rodgers and many other Independent Stylists lost up to 30% of the income they had previously derived from their work for Color Street.

31.     For this, and other, reasons, many high-level Independent Stylists began leaving Color Street.

32.     In January 2021, Rodgers decided to pursue her desire to write a book about her life and its struggles and successes. To this end, Rodgers connected with Tony Ferraro ("Ferraro") an author, publisher, professional executive coach, and organizational strategist, to discuss a strategy to write and publish a book and determine her next steps personally and professionally.

33.     Ultimately, Rodgers aspired to use her more nearly four decades of experience as a network marketing professional to create a company where other network marketing professionals could grow and thrive in a supportive environment free from the drama, greed, and corporate money-grabs often prevalent within network marketing companies. To this end, in July 2021, Rodgers caused Audere, Inc. ("Audere") to be formed.

34.     Even so, throughout 2021, Rodgers worked tirelessly on behalf of Color Street.

35.     In early January 2022, in conjunction with her publisher, Rodgers filmed a short, 12-minute documentary-style interview in which she told her life story.

36.     The interview was organized by her publisher and designed to promote her book.

37.     At no point during this documentary-style interview did Rodgers discuss Color Street or Audere. Rather, she discussed her life. The documentary-style interview was released to the public on August 26, 2022.

**The 2022 Leader Summit**

38.     Beginning on or about February 10, 2022, Color Street hosted its annual Leader Summit 2022 at the Grand Hyatt Baha Mar in Nassau Bahamas (the "2022 Leader Summit"). Rodgers was invited but was unable to attend.

39.     On or about February 10, 2022, during the 2022 Leader Summit, Color Street, including through the individual Defendants, announced that Rodgers was beginning a new company and was resigning from Color Street, and that Color Street would officially announce Rodgers' resignation from Color Street on February 11, 2022.

40.     Defendants' statement that Rodgers had resigned from Color Street was false at the time that it was made. Rather, at the time of these representations on February 10, 2022, Rodgers had neither resigned from Color Street, nor had she communicated any plan to Color Street to resign.

41.     Defendants' statements that Rodgers had resigned from Color Street were made with the intention to force Rodgers to resign from Color Street. Ultimately, Color Street's bullying worked.

42.     Speaking from the main stage during the 2022 Leader Summit, Schmitt waived around piece of paper as ostensible proof of her allegations, claiming, among other things, that:

a.   "Tracy Rodgers has vowed to take down Color Street";

      b.   Rodgers had secretly filmed a negative, expose-style documentary about Color Street which would air on Netflix; and

      c.   Rodgers had demanded money from Color Street.

43.     Each of the aforementioned statements made by Schmitt, both individually and on behalf of Color Street, was and is false and defamatory.

44.     During the 2022 Leader Summit, Color Street, and its leadership, including Park, Schmitt, and Polsgrove, further informed attendees that Rodgers had threatened Color Street and that she had said she was going to recruit people away from Color Street. These statements were similarly false.

45.     Color Street and its leadership, including Park, Schmitt, and Polsgrove, instructed attendees at the 2022 Leader Summit to spread these false statements of purported fact about Rodgers to the Independent Stylists in their respective downlines.

46.     These false statements of purported fact about Rodgers made by Color Street, Park, Schmitt, and Polsgrove at the 2022 Leader Summit were published to third parties by individuals in attendance at the 2022 Leader Summit including, but not limited to by text message, telephone, and via social media.

47.     These false statements of purported fact about Rodgers made by Color Street, Park, Schmitt, and Polsgrove at the 2022 Leader Summit were re-published including, but not limited to, by text message, telephone, and via social media.

48.     On or about February 11, 2022, Rodgers awoke at her home in Idaho to a flurry of text messages and social media posts informing her of the various false statements of purported fact made by Color Street and its leadership, including Park, Schmitt, and Polsgrove, at the 2022 Leader Summit.

49.     Rodgers received these text messages and social media posts from individuals in attendance at the 2022 Leader Summit as well individuals who did not attend at the 2022 Leader Summit, but to whom such false statements about Rodgers had been previously published by those in attendance.

50.     Rodgers first learned through these text messages and social media posts that, during the 2022 Leader Summit, Color Street had falsely announced that she had resigned from Color Street.

51.     Throughout the day on February 11, 2022, and thereafter, Rodgers observed numerous individuals associated with Color Street and other network marketing companies unfriend her on Facebook.

52.     This was particularly impactful as much of network marketing is based on an individual's connections, including connections made and maintained through social media.

53.     Because of what had transpired at the 2022 Leader Summit, including Defendants' false statements that Rodgers had resigned from Color Street, Rodgers felt she had no choice but to resign from Color Street.

54.     For this reason, following the false and defamatory statements by Color Street, Park, Schmitt, and Polsgrove at the 2022 Leader Summit, Rodgers resigned to Color Street on February 11, 2022.

55.     On February 19, 2022, Rodgers addressed Defendants' false and defamatory statements in a video posted to Facebook.

**The February Facebook Live Video**

56.     On or about February 20, 2022, Park hosted a Facebook live session on Color Street's Facebook account in which he responded to Rodgers' video with additional false and defamatory statements.

57.     The Facebook Live video was watched by Color Street Independent Stylists from across the country.

58.     During the video, Park represented that Rodgers' new company, Audere, did not have products to sell yet and called into question why anyone would join a nascent company without product, implying to the numerous Color Street Independent Stylists across the country who were watching that Rodgers was lying or otherwise lacked the business acumen necessary to run a viable company.

**The February Zoom Call**

59.     On or about February 24, 2022, Color Street hosted a Zoom call from its own account, which was led by Schmitt and Polsgrove.

60.     The Zoom call was attended by numerous Independent Stylists across the country.

61.     While Color Street typically recorded its Zoom calls, during this particular Zoom call, Schmitt and Polsgrove advised attendees that they were turning off the Zoom recording function to address the "situation" regarding Rodgers.

62.     After they stopped recording the Zoom call, Schmitt and Polsgrove read prepared statements addressing Rodgers and the video she released on Facebook on February 19, 2022.

63.     Schmitt and Polsgrove also read from a letter from a California attorney dated February 3, 2022, as well as an email from Ferraro dated February 9, 2022, both of which they wrongly attributed to Rodgers.

64.     Rodgers did not draft the letter or email, and is not a resident of California.

65.     Schmitt and Polsgrove knew or should have known that Rodgers did not author the letter or the email from which they were reading and the terms of which they attributed to Rodgers.

66.     Schmitt and Polsgrove also repeated the false and defamatory statements about Rodgers that Defendants had previously made during the 2022 Leader Summit, as set forth above.

67.     Schmitt and Polsgrove also falsely represented that Rodgers lied in the Facebook video she posted on February 19, 2022.

68.     Upon information and belief, on multiple occasions, Park has boasted about having enough money to drain others financially through litigation, regardless of the merits or outcome.

69.     With respect to Rodgers, both during and after Color Street's 2022 Leader Summit, Park made comments to the effect of "I am going to make Tracy homeless again."

70.     Park made these statements knowing that Rodgers had, in fact, previously been homeless, and had worked hard to turn her life into a success story. Park made these statements with actual malice, and with the intention to cause Rodgers to fear Park and the financial and emotional damage he threatened to cause her.

71.     Park made these statements with the intent to instill fear in those connected to or otherwise associated with Rodgers that he might seek to inflict emotional and financial harm on them as well. And, Park made these statements in an attempt to alienate Rodgers from those within her network

72.     Color Street placed Park, Schmitt, and Polsgrove in a position to address those in attendance at the 2022 Leader Summit as well as those gathered on the February Facebook Live video and the February Zoom call with an air of confidence and authority as to the matters about which they were speaking.

73.     Attendees of the 2022 Leader Summit were justified in presuming that Color Street's leadership, including Park, Schmitt, and Polsgrove, were acting at the behest and authority of Color Street, including when making the false and defamatory statements about Rodgers.

74.     Attendees of the February Facebook Live video were justified in presuming that Park, as the founder and CEO of Color Street, was acting at the behest and authority of Color Street throughout that video.

75.     Attendees of the Zoom call on or about February 24, 2022, were justified in presuming that Schmitt and Polsgrove were acting at Color Street's behest and with its authority throughout the Zoom call because they are high-ranking members of Color Street, they had spoken on Color Street's behalf before, Color Street gave them the opportunity to speak, and they addressed the Zoom attendees from an account labeled "Color Street."

76.     Moreover, Schmitt and Polsgrove had previously spoken at Color Street events prior to the 2022 Leader Summit and February 24, 2022 Zoom call, further lending credence to their apparent knowledge and authority with respect to matters concerning Color Street.

**Color Street Commences Arbitration v. Rodgers and McCauley**

77.     On February 28, 2022, Color Street commenced an arbitration before the American Arbitration Association ("AAA") in AAA Case No. 012200008471 asserting claims against Plaintiffs alleging (i) breach of contract; (ii) breach of implied duty of good faith and fair dealing; (iii) misappropriation of confidential information; (iv) violation of the New Jersey Trade Secrets Act; (v) unjust enrichment; (vi) tortious interference; (vii) independent contractor raiding; (viii) negligent misrepresentation; (ix) fraud; (x) unfair competition; and (xi) injunctive relief.

78.     Color Street's sole basis that AAA has jurisdiction to arbitrate Color Street's claims against Plaintiffs is its allegation that Plaintiffs agreed to the terms of a May 2021 Independent Stylist Agreement ("ISA") that is a clickwrap agreement, meaning that the party agreeing to such terms must "click" a box on Color Street's website acknowledging such agreement.

79.     Alternatively, Color Street claims that Rodgers and/or McCauley assented to Color Street's Policies and Procedures, which incorporates the terms of the ISA, and therefore the arbitration provision, by reference.

80.     Currently, on Color Street's website, an updated version of the ISA and the Policies and Procedures are presented clickwrap agreements.  An individual signing up as an Independent Stylist with Color Street today must agree to the terms of these agreements by clicking a box acknowledging their agreement to such terms and conditions.

81.     However, at the time that Rodgers and McCauley joined Color Street, no such agreements existed, either as clickwrap agreements or otherwise.

82.     Despite repeated requests, Color Street has failed and refused to provide documentation or other evidence that Rodgers and/or McCauley agreed to the terms of the May 2021 ISA or the Policies and Procedures it now seeks to enforce and, specifically, that Rodgers and/or McCauley express agreed to the arbitration provision pursuant to which they purportedly waived their right to a jury trial.

83.     Moreover, despite repeated requests, Color Street has failed and refused to provide documentation or other evidence that Rodgers and/or McCauley agreed to *any* prior version of the ISA at all, including prior versions of the ISA containing a mandatory arbitration provision, or otherwise acquiesced to arbitrate claims by and between either of them and Color Street, or otherwise waived their rights to a jury trial.

84.     Notably each of the agreements on which Color Street relies as its basis for arbitration is dated years after Rodgers and McCauley each respectively joined Color Street.

85.     Rodgers and McCauley have objected to the jurisdiction of the arbitrator. However, because they did not consent to the ISA containing the mandatory arbitration provision, because they

did not consent to arbitration, and because they did not consent to waive their right to trial by jury, they seek a declaration from this Court that Color Street's claims against them are not arbitrable.

**FIRST CLAIM FOR RELIEF**
**Declaratory Judgment, I.C. § 10-1201**
**(Plaintiffs v. Color Street)**

86.     Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

87.     Color Street commenced an arbitration against Rodgers and McCauley before the American Arbitration Association in AAA Case No. 012200008471, alleging that Plaintiffs are bound by the terms of an Independent Stylist Agreement dated May 2021, including the arbitration provision therein, as well as Policies and Procedures dated 2019.

88.     Despite requests, Color Street has failed and refused to provide documentation or other evidence that Plaintiffs executed or otherwise agreed to the ISA and, as relevant here, specifically assented to waive their right to a jury trial or otherwise agreed to arbitration.

89.     Despite repeated requests, Color Street has been unwilling and unable to provide evidence that Plaintiffs, or either of them, agreed to the terms of the ISA, including the arbitration provision therein, or to the Policies and Procedures.

90.     Rather, the limited information provided by Color Street indicates that the IP address from which such assent was given was done by Color Street, at its offices in New Jersey, *not* in Idaho, where Plaintiffs currently reside, or Washington, where they lived when they first joined Color Street.

91.     Upon information and belief, *after* Plaintiffs signed up with Color Street, Color Street employees – *not* Plaintiffs or either of them – indicated Plaintiffs' consent to any such terms through Color Street's back office without Plaintiffs' knowledge or approval.

92.     Color Street cannot unilaterally waive Plaintiffs' right to a jury trial and cannot unilaterally assent on behalf of Plaintiffs to arbitrate any controversy that may arise. Plaintiffs did not consent to arbitration, explicitly or implicitly.

93.     This Court has jurisdiction over the controversy and may declare the rights and other legal relations of Plaintiffs seeking such declaration.

94.     Pursuant to I.C. § 10-201, Plaintiffs are entitled to a declaration that they are not bound by the terms of the ISA, and, specifically, the arbitration provision set forth in the ISA, directly or, indirectly, through the Policies and Procedures which references the ISA.

95.     This Court should issue a declaration that Plaintiffs are not bound by the ISA, including the arbitration provision therein, or the Policies and Procedures, and should order that this Court has the sole and exclusive jurisdiction for claims alleged against Plaintiffs in the arbitration.

**SECOND CLAIM FOR RELIEF**
**Defamation – Common Law and Pursuant to Idaho Code Ann. § 18-4801**
**(Rodgers v. All Defendants)**

96.     Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

97.     At the 2022 Leader Summit on or about February 10, 2022, Defendants communicated false and defamatory information about Rodgers to others including, but not limited to:

      a.   that Rodgers had written threatening letters to Color Street;

      b.   that Rodgers had vowed to take down Color Street;

      c.   that Rodgers had demanded money from Color Street; and

      d.   that Rodgers had filmed a negative documentary about Color Street which would air on Netflix and which would "take down Color Street".

98.     During a Facebook Live video on or about February 20, 2022,

a. Stating that Rodgers' new company, Audere, was a company without a product or an illusion, intentionally implying that Rodgers was lying about Audere or otherwise lacked the business acumen to create and operate a viable network marketing company; and

b. Stating that Rodgers had lied in her February 19, 2022 Facebook video.

99. During Color Street's February 24, 2022 Zoom call, Defendants communicated false and defamatory information about Rodgers to others including, but not limited to:

a. Re-publishing the false and defamatory statements Defendants had previously made during the 2022 Leader Summit;

b. Reading from and then falsely attributing language and responsibility in a February 3, 2022 letter from California legal counsel to Rodgers, as well as reading from an attributing language and responsibility for a February 9, 2022 email to Rodgers;

c. Falsely representing the contents of those communications and attributing them to Rodgers; and

d. Stating that Rodgers had lied in her February 19, 2022 Facebook Live video.

100. The false and defamatory statements about Rodgers that were made by Color Street, Park, Schmitt, and Polsgrove exposed Rodgers to contempt and resulted in a loss of goodwill among others in the network marketing space, damaged her reputation, caused others to cease their associations with her, deterred others to commence associating with her, and concerned matters of significant importance related to Rodgers' work within the network marketing industry.

101.     The false and defamatory statements about Rodgers that were made by Color Street, Park, Schmitt, and Polsgrove were published to third parties during the 2022 Leader Summit, during a Facebook Live video and during a Zoom call on or around February 24, 2022.

102.     The false and defamatory statements about Rodgers were re-published by third parties in writing, by text message and through social media, as well as verbally.

103.     Color Street, Park, Schmitt, and Polsgrove made false and defamatory statements about Rodgers negligently by failing to ascertain the truth or falsity of their statements.

104.     Color Street, Park, Schmitt, and Polsgrove made these false and defamatory statements intentionally or with reckless disregard for their veracity.

105.     Park, Schmitt, and Polsgrove made these false and defamatory statements about Rodgers as Color Street's agents with Color Street's actual or apparent authority.

106.     At all material times, Color Street exercised control over Park, Schmitt, and Polsgrove, including the manner or method of their work and the directions they were to provide to those in their respective downlines.

107.     At all material times, Park, Schmitt, and Polsgrove were Color Street's employees, acting within the course and scope of their employment with Color Street, and acting for the benefit of Color Street.

108.     Park, Schmitt, and Polsgrove are individually liable for the false and defamatory statements they made about Rodgers and the damage to her resulting therefrom.

109.     Color Street is directly liable for its own false defamatory statements and is also vicariously liable for the respective wrongdoing of Park, Schmitt, and Polsgrove and the damages they each caused to Rodgers.

110.    As a result of the false and defamatory statements about Rodgers made by Color Street, Park, Schmitt, and Polsgrove, Rodgers has incurred damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### Intentional Interference with Prospective Economic Advantage
### (Rodgers v. All Defendants)

111.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

112.    At all material times, Rodgers had a reasonable expectation of economic advantage or benefit from her success in the network marketing industry using her personal connections and social media. These personal connections were built, developed, and maintained by Rodgers without the assistance of Color Street, and they belonged to Rodgers.

113.    At the time Defendants made the false and defamatory statements about Rodgers as set forth above, they knew that she had an ongoing economic relationship with her network marketing connections.

114.    At the time Defendants made many of the false and defamatory statements about Rodgers as set forth above, they knew that she had not resigned from Color Street.

115.    Defendants knew that Rodgers had formed Audere with the intention that it would become a network marketing company.

116.    Defendants made these false and defamatory statements and otherwise directly stated or implied that Rodgers was a liar or con artist lacking the business acumen to create and run a viable enterprise.

117.    Defendants knew that the personal connections that Rodgers had built, developed, and maintained during her nearly forty years in network marketing would be beneficial to her

continued work for Color Street and/or her future work in any field that would benefit from network marketing, including Audere.

118.    Defendants knew that Rodgers had developed a network of public speaking engagements that would also be impacted by their false and defamatory statements.

119.    Defendants intentionally and wrongfully interfered with Rodgers' personal connections that she had built, developed, and maintained and the prospective economic advantage they afforded Rodgers including, but not limited to, by making these false and defamatory statements about her and about Audere to inflict harm on her and impair her ability to work within the network marketing circles and in public speaking.

120.    Defendants' interference was done intentionally, wrongfully and with malice.

121.    Park further interfered by making statements to the effect of "I am going to make Tracy Rodgers McCauley homeless again" and boasting about having enough money to litigate Rodgers and Audere out of existence.

122.    In addition to making false and defamatory statements about Rodgers to alienate these connections and damage her social outreach, Defendants threatened legal action against anyone who associated with Rodgers or her new business, Audere.

123.    As a result of Defendants' false and defamatory statement and wrongdoing, many of Rodgers' network marketing contacts which she had developed over a period of decades unfriended her on social media or otherwise ceased to communicate with her, resulting in an actual disruption of the economic benefits she had enjoyed, and would have otherwise enjoyed, from the connections she had made.

124.    As a proximate result of Defendants' intentional interference, Rodgers has suffered and will continue to suffer direct, consequential and/or incidental damages in an amount to be determined at trial.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs Tracy Rodgers and Robert McCauley respectfully request the following relief:

A.  A declaration from this Court that they are not bound by the Independent Stylist Agreement including, but not limited to, the arbitration provision therein, or the Policies and Procedures, and that this Court has exclusive jurisdiction over any claims Color Street purports to have against Plaintiffs;

B.  An order staying AAA Case No. 012200008471 pending determination of the declaratory relief sought herein;

C.  Damages in an amount to be determined at trial, plus pre-judgment and post-judgment interest;

D.  An order enjoining Defendants from making further false and defamatory statements or engaging in other, similar retaliatory conduct towards Rodgers;

E.  An order mandating Defendants retract their false and defamatory statements about Rodgers;

F.  Costs and fees incurred in this action as permitted by contract, statute, or other applicable law; and

G.  For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED this 15th day of September, 2022.

Respectfully submitted,

COLLINS LAW PLLC

_____

Brindee L. Collins, ISBN 9216
*Attorneys for Plaintiffs Tracy Rodgers and Robert McCauley*